**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION,**

|                          |                     |
|--------------------------|---------------------|
| **Plaintiff,**           | **1:15-cv-877**     |
|                          | **(GLS/TWD)**       |
| **v.**                   |                     |
| **DRAPER DEVELOPMENT LLC,** |                  |
| **Defendant.**           |                     |

_____

| **APPEARANCES:** | **OF COUNSEL:** |
|------------------|-----------------|
| **FOR THE PLAINTIFF:** | |
| Equal Employment Opportunity Commission | CHARLES F. COLEMAN, JR., ESQ. |
| 33 Whitehall Street, 5th Floor | NORA E. CURTIN, ESQ. |
| New York, NY 10004 - 2112 | ROBERT D. ROSE, ESQ. |
| | |
| 94 Smallwood Drive | JUDITH A. BILTEKOFF, ESQ. |
| Snyder, NY 14226 | |
| | |
| **FOR THE DEFENDANT:** | |
| LaFave, Wein & Frament, PLLC | CYNTHIA S. LAFAVE, ESQ. |
| 2400 Western Avenue | JASON A. FRAMENT, ESQ. |
| Guilderland, NY 12084 | PAUL H. WEIN, ESQ. |
| | |
| O'Connell, Aronowitz Law Firm | MEREDITH H. SAVITT, ESQ. |
| 54 State Street, 9th Floor | |
| Albany, NY 12207 | |

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

The Equal Employment Opportunity Commission (EEOC) brings this sex discrimination action under Title VII of the Civil Rights Act of 1964[1] and Title I of the Civil Rights Act of 1991[2] against defendant Draper Development LLC.  (Compl., Dkt. No. 1.)  Pending are both parties' cross-motions for summary judgment and Draper's motion for spoliation sanctions.  (Dkt. Nos. 57, 58.)  For the following reasons, all motions are denied.

## II. Background

### A. Facts[3]

### 1. Draper

Draper is a New York corporation headed by Lawrence Jasenski, Jr. and Paul Harding.  (Pl.'s Statement of Material Facts (SMF) ¶ 1, Dkt. No. 58, Attach. 3.)  As franchisee, Draper owns and operates Subway restaurants throughout the Capital Region and has approximately 190

---

[1] *See* 42 U.S.C. §§ 2000e-2000e-17.

[2] *See* 42 U.S.C. § 1981a.

[3] Unless otherwise noted, the facts are undisputed.

employees.  (*Id.* ¶ 2; Dkt. No. 64, Attach. 3 ¶ 15.)

On January 2, 2013, Draper hired Nicolas Kelly as a general manager.  (Pl.'s SMF ¶ 2.)  Although he worked at various restaurant locations, Kelly worked at the Rotterdam Square Mall restaurant from September 26, 2013 to October 18, 2013.  (*Id.* ¶¶ 12-13.)  As general manager, Kelly was responsible for reviewing applications, hiring, training, scheduling, and terminating employees.  (*Id.* ¶¶ 3, 5.)  However, Kelly was only empowered to hire crew members and "had no authority to hire . . . assistant managers."  (Dkt. No. 58, Attach. 15 at 100; Dkt. No. 62, Attach. 24 ¶ 4.)

There is a dispute over whether Draper was "actively" hiring at the Rotterdam Square Mall restaurant in October 2013.  (Dkt. No. 58, Attach. 16 at 74; Dkt. No. 62, Attach. 24 ¶ 5.)  However, it is undisputed that Draper was accepting applications for crew member and assistant manager positions and interviewing applicants at the Rotterdam Square Mall restaurant during this time.  (Pl.'s SMF ¶¶ 15-16, 46, 51.)  The qualifications for both positions were minimal: crew members did not need prior work experience, (*id.* ¶ 24), and assistant managers had to be available to work more than thirty hours per week, but did not need to

3

meet a minimum education requirement or have previous work experience, (*id.* ¶¶ 25-26).

    2.    *J.J.*

J.J. is a female who submitted an in-person application for a crew member position at Draper's Rotterdam Square Mall restaurant when she was seventeen years old.  (*Id.* ¶¶ 46-47.)  Thereafter, Kelly interviewed her in the Rotterdam Square Mall food court.[4]  (*Id.* ¶¶ 49, 51.)  During the interview, Kelly told J.J. that he wanted to hire someone from his old high school, where she attended, and that it would be nice to have a girl around.  (*Id.* ¶ 55.)  J.J. also had previous experience in food service and sandwich making.  (*Id.* ¶ 48.)  Overall, Kelly thought J.J. "seemed very intelligent, understood a lot, . . . handled herself well," and was qualified for the crew member position.  (*Id.* ¶¶ 53-54.)  It is unclear whether Kelly offered J.J. the job at that time, (Dkt. No. 62, Attach. 27 ¶ 56), but it is undisputed that he intended to offer her the job and told her that he would get back to her, (Dkt. No. 57, Attach. 10 at 83; Dkt. No. 58, Attach. 18 at

---

[4] The parties dispute when J.J. actually applied for the position or was interviewed, and neither party provides a citation to the record that evinces these dates.  (Dkt. No. 62, Attach. 27 ¶¶ 46, 49.)  Kelly testified that he reviewed J.J.'s application and believed he interviewed her on October 10.  (Dkt. No. 58, Attach. 16 at 110.)  But J.J. seemed to testify that she applied in May 2014 and was interviewed on the same day that she submitted the application.  (*Id.*, Attach. 20 at 42, 49, 52.)

54).

Following the interview,[5] J.J. alleges that she received a sexually-explicit text from Kelly, which she understood as a request that she have sex with him in exchange for the job.  (Pl.'s SMF ¶¶ 57-60.)  However, whether Kelly actually texted J.J. and the contents of such a text are in dispute.[6]  (*Id.* ¶ 69; Dkt. No. 62, Attach. 27 ¶¶ 57-60.)  Nonetheless, Draper fails to controvert J.J.'s testimony that she returned to Draper's Rotterdam Square Mall restaurant to complain about something.  (Dkt. No. 62, Attach. 27 ¶¶ 62-65.)  After being given the owner's cell phone number by a female manager, she was hung up on.  (*Id.*)  Thereafter, J.J. suffered extreme nausea and so much stress that she was eventually hospitalized.  (*Id.* ¶¶ 66-68.)

Ultimately, Draper did not hire J.J.  (Pl.'s SMF ¶ 70.)  On April 18, 2014, she filed an EEOC charge[7] alleging sexual harassment and sex discrimination.  (*Id.* ¶ 71.)

---

[5] Again, the EEOC fails to provide a clear date for when this occurred.

[6] Draper points out that J.J.'s testimony is the only evidence of a text from Kelly because "[n]o one else saw this alleged text but [J.J.], her phone which it was on was lost sometime between August of 2014 and August of 2015[,] and the i[P]od she used [to text Kelly back] was allegedly broken."  (Dkt. No. 64, Attach. 3 ¶ 50.)

[7] As discussed in greater detail below, Draper contends that J.J.'s charge was untimely and named the wrong employer.  (Def.'s SMF ¶¶ 2-4, Dkt. No. 57, Attach. 1; Attach. 24 at 10-13.)

*3.* *A.R.*

On October 7, 2013, A.R., another seventeen-year old-female, submitted an online application for a job as a crew member at one of Draper's restaurants. (*Id.* ¶¶ 16-18.) A.R. graduated a year early from high school and was available to work forty hours per week. (*Id.* ¶ 20.) She also had previous experience in food service and sandwich making. (*Id.* ¶ 23.) After she scored a four out of five on the test used for online applicants, Draper distributed her application to Kelly. (*Id.* ¶¶ 21-22.) However, A.R. never received an interview with Draper. (Def.'s SMF ¶ 13; Dkt. No. 57, Attach. 1.)

Instead, on October 15, 2013, Kelly got A.R.'s cell phone number from her application and proceeded to text her the following from Draper's restaurant:

> **Kelly:** Hi how badly do you need a job
> **A.R.:** Whos this?
> **Kelly:** An employer
> **A.R.:** Where?
> **Kelly:** In the mall
> **Kelly:** Guess not
> **A.R.:** Ok where in the mall?
> **Kelly:** Would you sleep with the manager to get the job?
> **A.R.:** Maybe if [I know] who this is
> **Kelly:** Subway
> **Kelly:** Im looking for an asst manager

> **A.R.:** Do u even know me?
> **Kelly:** Bang my brains out the job is yours
> **Kelly:** We swap pics and decide
> **Kelly:** No
> **Kelly:** [Photo of Kelly]
> **A.R.:** Which Subway u wrk at?
> **Kelly:** Rotterdam

(Pl.'s SMF ¶¶ 28-29, 35 (citing Dkt. No. 58, Attach. 7) (alterations to original).)[8]  Understandably, A.R. claims that these unwelcome texts made her feel "disgusted, scared, embarrassed[,] . . . humiliated[,] . . . nause[ous,] and gave her stomach pains."  (*Id.* ¶¶ 30-31.)  Thereafter, she and her boyfriend went to Draper's Rotterdam Square Mall restaurant to complain and subsequently filed an incident report with the Schenectady Police Department.  (*Id.* ¶¶ 32, 36-37.)

After hearing about the incident from a news report and conducting an internal investigation, Draper fired Kelly on October 18, 2013 for "requesting or demanding sexual favor, accompanied by implied or overt promise of preferential treatment or threats."  (*Id.* ¶¶ 41, 43; Def.'s SMF ¶ 14.)

Ultimately, Draper did not hire A.R.  (Pl.'s SMF ¶ 70.)  On October

---

[8] Although A.R. no longer has the cell phone that she received the texts on, (Dkt. No. 64, Attach. 3 ¶ 59), screen shots of the relevant text messages were preserved, (Dkt. No. 58, Attach. 7).

31, 2013, she filed an EEOC charge[9] alleging sexual harassment and sex discrimination.  (*Id.* ¶ 44.)

## B.    Procedural History

On July 21, 2015, the EEOC filed a complaint on behalf of J.J. and A.R. (hereinafter, "the charging parties") "to correct unlawful employment practices on the basis of sex."  (Compl. at 1.)  It contends that "Draper . . . discriminated against the [c]harging [p]arties on the basis of sex by subjecting them to sexual harassment and failing to hire them."  (*Id.*)  The EEOC's statement of claims does not specifically delineate any claim.  (*Id.* ¶¶ 13-16.)

Pending is Draper's motion for summary judgment and spoliation sanctions, (Dkt. No. 57), and the EEOC's cross-motion for partial summary judgment, (Dkt. No. 58).[10]  For the following reasons, the

---

[9] As discussed in greater detail below, Draper disputes that A.R. filed a "charge" given their position that the documents A.R. filed were invalid because they were not notarized.  (Dkt. No. 62, Attach. 27 ¶ 44; Def.'s SMF ¶ 1.)

[10] The parties largely talk over each other.  As demonstrated quintessentially by this action, litigants—and, in turn, courts—use a variety of categories to couch their analysis of Title VII sex discrimination claims.  Here, the EEOC seems to characterize this action as involving separate claims of sex discrimination: sexual harassment and failure to hire.  (*See, e.g.*, Dkt. No. 64 at 2 n.2; Dkt. No. 67 at 1.)  On the other hand, Draper initially defends against a hostile work environment theory, (Dkt. No. 57, Attach. 24 at 13-14), before eventually conducting a *quid pro quo* sexual harassment analysis, (*id.* at 20-22).  Because courts look "to the substance of the alleged misconduct of which the plaintiff complains rather than the terms used to describe it," *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 604 (2d Cir. 2006), the EEOC's sex discrimination claims are most appropriately analyzed under the legal framework pertaining to *quid pro quo* sexual harassment.  Nonetheless, the court declines to foreclose any alternative avenues for relief at this juncture given that claims survive for trial.

motions are denied.

## III.  Standard of Review[11]

The standard of review pursuant to Rule 56 of the Federal Rules of Civil Procedure is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV.  Discussion

## A.    Exhaustion of Administrative Remedies

Before addressing the merits of EEOC's claims, Draper argues that this action is barred because the charging parties failed to exhaust administrative remedies.[12]  (Dkt. No. 57, Attach. 24 at 8-13.)

### 1.    *Verification of A.R.'s EEOC Charge*

As Draper points out, "it is undisputed that A.R.'s charge was n[ot] sworn to under oath, affirmed[,] or otherwise verified . . . [and neither] [the] EEOC nor A.R. ever sought leave to amend the charge."  (*Id.* at 10.)  The

---

[11] For clarity's sake, Draper's motion for spoliation sanctions is not governed by this standard of review, but instead by the standard recited below.  *See infra* Part IV.D.

[12] In the future, Draper is directed to adhere to the Local Rules by including a table of contents in its memoranda of law.  *See* N.D.N.Y. L.R. 7.1(a)(1).

only issue is what consequences ought to flow from this lack of verification.

"Before an aggrieved party can assert a Title VII claim in federal court, [s]he is generally required to exhaust the administrative remedies provided by the statute." *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018). Accordingly, the plaintiff must first file a "charge" with the EEOC, which "shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires." 42 U.S.C. § 2000e-5(b).[13]

> [T]he verification provision is meant to provide some degree of insurance against catchpenny claims of disgruntled, but not necessarily aggrieved, employees. In requiring the oath or affirmation, however, Congress presumably did not mean to affect the nature of Title VII as a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.

*Edelman v. Lynchburg Coll.*, 535 U.S. 106, 115 (2002) (internal quotation marks and citation omitted). Accordingly, the Supreme Court has advised that technical readings of Title VII are "particularly inappropriate." *Zipes v.*

---

[13] EEOC regulations further clarify that such charge "shall be in writing and shall be verified." 29 C.F.R. § 1601.9. The term "verified" is defined by regulation as "sworn to or affirmed before a notary public, designated representative of the Commission, or other person duly authorized by law to administer oaths and take acknowledgments, or supported by an unsworn declaration in writing under penalty of perjury." *Id.* § 1601.3(a).

*Trans World Airlines, Inc.*, 455 U.S. 385, 397 (1982) (internal quotation marks and citation omitted).  Ultimately, the purpose of the exhaustion requirement "is to give the administrative agency the opportunity to investigate, mediate, and take remedial action," *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (internal quotation marks and citation omitted), and to "enable[] the EEOC to provide the alleged wrongdoer with notice and to permit possible conciliation," *Fleming v. Verizon N.Y., Inc.*, 419 F. Supp. 2d 455, 462 (S.D.N.Y. 2005) (internal quotation marks and citation omitted).  However, "administrative exhaustion is not a *jurisdictional* requirement; rather, it is merely a precondition of suit and, accordingly, it is subject to equitable defenses." *Fowlkes*, 790 F.3d at 384.

    In a related context, the Second Circuit has found that "a complete absence of verification affords a basis for dismissal." *EEOC v. Sears, Roebuck and Co.*, 650 F.2d 14, 18 (2d Cir. 1981).  However, neither party points to Second Circuit precedent taking a stance on whether a lack of verification requires such a result.  Instead, Draper asks the court to adopt the approach of various Circuit Courts which would warrant dismissal here.  (Dkt. No. 57, Attach. 24 at 9-10 (citing *Vason v. City of*

*Montgomery*, 240 F.3d 905, 907 (11th Cir. 2001); *Hodges v. Nw. Airlines*, 990 F.2d 1030, 1032 (8th Cir. 1993); *EEOC v. Appalachian Power Co.*, 568 F.2d 354, 355 (4th Cir.1978); *Danley v. Book-of-the-Month Club, Inc.*, 921 F. Supp. 1352, 1354 (M.D. Pa. 1996), *aff'd*, 107 F.3d 861 (3d Cir. 1997)).) However, these decisions are neither binding nor convincing. Rather, the sensible approach taken by the Fifth Circuit and the Third Circuit is more appropriate. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F. 3d 256, 265 (3d Cir. 2006) (finding that where "an employer has actual notice of a discrimination charge and chooses to respond to the merits of the claim before the EEOC without asserting lack of verification as a defense, it waives its right to secure dismissal of the federal court proceedings on that basis"); *Price v. Sw. Bell Tel. Co.*, 687 F.2d 74, 77 n.3 (5th Cir. 1982) ("[W]e do not . . . view the verification element as jurisdictional . . . courts must remain flexible when reviewing failures of persons unfamiliar with administrative complexities to comply with procedural rules . . . [and] should not regard such rules as rigid jurisdictional prerequisites.").

The court agrees that, in certain situations,

[c]onstruing the verification requirement more flexibly, to take

12

> equitable considerations into account, comports with the broad remedial purposes of Title VII . . . without compromising the verification requirement's narrower objective . . . of protecting employers from the disruption and expense of responding to a claim unless a complainant is serious enough and sure enough to support it by oath subject to liability for perjury.

*Buck*, 452 F.3d at 263 (internal quotation marks and citation omitted).

Here, A.R.'s signature appears on both the charge and the intake questionnaire. (Dkt. No. 57, Attach. 3; Dkt. No. 58, Attach. 4.) Although her signature is not notarized, she nonetheless indicated that she swore or affirmed that she "read the above charge and that it is true to the best of [her] knowledge, information[,] and belief." (*Id.*) The charge set the administrative machinery in motion by clearly describing the identity of the parties and the alleged discriminatory conduct. (*Id.*) In turn, A.R.'s charge enabled the EEOC to notify Draper that it was investigating A.R.'s Title VII sex discrimination claim based on "sexual harassment and failure to hire." (Dkt. No. 64, Attach. 13.) The EEOC also provided a copy of the charge to Draper. (*Id.*) The parties engaged in a conciliation process. (Compl. ¶¶ 8-11.) Notably, Draper's CEO responded to A.R.'s EEOC charge on the merits and failed to assert any procedural defect related to the charge's lack of verification at that time. (Dkt. No. 64, Attach. 15.)

Moreover, there is no concern that statements in A.R.'s unverified claim are frivolous because Draper admits that the inappropriate text messages at issue were sent by Kelly on October 15, 2013. (Dkt. No. 62, Attach. 27 ¶ 29.) As such, Draper fails to demonstrate that it suffered any prejudice from this technical defect. (*See generally* Dkt. No. 57, Attach. 24.)

Conversely, A.R. would be severely prejudiced if the court were to construe the lack of verification as grounds for dismissing the EEOC's claim. Such an inequitable result would not advance Congress's goal of empowering the EEOC to prevent employers from engaging in unlawful employment practices, *see* 42 U.S.C. § 2000e-5(a), nor would such a technical reading be appropriate to uphold a "statutory scheme in which laymen, unassisted by trained lawyers, initiate the process," *Zipes*, 455 U.S. at 397 (internal quotation marks and citation omitted). Accordingly, this portion of Draper's motion is denied.

2.  *Timeliness*

Draper argues that J.J.'s claim should be dismissed because the EEOC did not file this action within 180 days of the alleged wrongful act. (Dkt. No. 57 Attach. 24 at 10-12.) The EEOC does not dispute that it filed the complaint outside the 180-day window; instead, it contends that the

applicable window for filing is 300 days because J.J. also filed the charge with the New York State Division of Human Rights (NYSDHR).  (Dkt. No. 64 at 12.)

42 U.S.C. § 2000e-5(e)(1) provides that

[a] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred[.]

The parties dispute whether J.J. actually filed her charge with the NYSDHR.  (Def.'s SMF ¶ 2; Dkt. No. 64, Attach. 3 ¶¶ 2, 74.)  However, given that J.J.'s charge lists the NYSDHR in the state agency box and is sworn to by her, (Dkt. No. 57, Attach. 4), it is reasonably inferred that the charge was filed with the NYSDHR so as to extend the filing window to 300 days.  Draper's unproven contention to the contrary presents an issue of fact for trial.  Accordingly, Draper's motion in this regard is denied.

*3.*    *Properly Named Party*

Next, Draper argues that J.J. also failed to exhaust administrative

remedies because she named the employer as "Subway," rather than "Draper," in her charge. (Dkt. No. 57, Attach. 24 at 12-13 (citing 42 U.S.C. § 2000e-5(f)(1)).) Again, Draper did not raise any issue with the named employer when it received prompt notice of J.J.'s charge and thereafter responded to the charge. (Dkt. No. 64, Attach. 3 ¶¶ 74-75, 110). As such, dismissing a claim on such an inequitable basis would ride roughshod over the Supreme Court's advice for courts to be flexible in these actions commenced by laypersons—especially in light of the EEOC's observation that both A.R. and J.J. "were 17 years old . . . [and likely] understood they were applying to work at Subway, rather than Draper, a company that neither of them likely had even heard of." (Dkt. No. 64 at 10.) For these reasons, and the additional reasons provided by the EEOC, (*id.* at 9-11), Draper has failed to convince the court that the claims related to J.J.'s charge should be dismissed on this basis.

**B.    *Quid Pro Quo* Sex Discrimination**

Given that Title VII analysis contained within the parties' cross-motions for summary judgment center on similar issues and incorporate arguments set forth in various papers, they are discussed together.

Title VII states: "[i]t shall be an unlawful employment practice for an

employer (1) to fail or refuse to hire . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a).  A plaintiff proceeding under a *quid pro quo* theory of sex discrimination must "'establish that she was denied an economic benefit either because of gender or because a sexual advance was made by a supervisor and rejected by her.'"  *Lekettey v. City of New York*, 637 F. App'x 659, 661 (2d Cir. 2016) (quoting *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir.1992)).

> If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.  But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).[14]  For purposes of this analysis, an

---

[14] The Second Circuit has held that "[b]ecause the *quid pro quo* harasser, by definition, wields the employer's authority to alter the terms and conditions of employment—either actually or apparently—the law imposes strict liability on the employer for *quid pro quo* harassment."  *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994); *see Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 579 (2d Cir. 1989).  Even after the Supreme Court's ruling in *Ellerth*, some courts within this Circuit

employee is considered a supervisor "if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at 424. And "tangible employment action" is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 429 (internal quotation marks and citation omitted).

Notably, "traditional agency principles [a]re relevant for determining employer liability." *Faragher*, 524 U.S. at 776. As such, courts have recognized that

> An employer may also be held liable where a supervisor's *quid pro quo* threat exceeds his actual authority, but the victim reasonably relies on the supervisor's threat because of his apparent authority. Apparent authority, appropriately described . . . as the shadow of actual authority, . . . exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized, and the third person actually believes the agent to be authorized. Thus, only where it would be reasonable for a victim of harassment to believe that the authority used to harass had been delegated to the supervisor would liability ensue.

---

automatically impute *quid pro quo* conduct onto the employer under *Karibian*. *See, e.g.*, *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 460 (S.D.N.Y. 2013). However, although the court does not doubt the continued applicability of these cases in the wake of *Ellerth*, it follows a more roundabout analysis as articulated in *Vance*. Nonetheless, given that Draper has failed to demonstrate that it is entitled to rely on the *Faragher/Ellerth* affirmative defense, the court need not address its corresponding analysis. (Dkt. No. 57, Attach. 24 at 15-20.)

18

*Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 500 (7th Cir. 1997)

(citing Restatement (Second) of Agency §§ 8 cmt. c, 219(2)(d)) (internal

quotation marks and footnote omitted); *see Ellerth*, 524 U.S. at 759 ("If . . .

it is alleged there is a false impression that the actor was a supervisor,

when he in fact was not, the victim's mistaken conclusion must be a

reasonable one.").  Whether a plaintiff is reasonable in believing that a

purported supervisor had the apparent authority to do what he promised

"is a question best left for a jury."  *See DeWitt v. Lieberman*, 48 F. Supp.

2d 280, 290 (S.D.N.Y. 1999).

Draper seeks summary judgment on all claims based on its

contention that, because "Kelly's alleged actions did not culminate in a

tangible employment action . . . [it] can rely on the *Faragher/Ellerth*

[a]ffirmative [d]efense."  (Dkt. No. 57, Attach. 24 at 15-16 (italics added to

replace underlining).)  Meanwhile, the EEOC seeks summary judgment on

the claim involving A.R., (Dkt. No. 58, Attach. 1 at 9-11), but concedes

that it is precluded from seeking summary judgment on J.J.'s claims given

the dispute over the alleged texts sent to J.J, (*id.* at 1 n.1).

1.    *J.J.*

It is undisputed that Draper never hired J.J. as a crew member,

despite the fact that she was qualified for the position.  (Pl.'s SMF ¶¶ 53-54, 70.)  Draper's argument, that—even assuming he sent J.J. a text inquiring as to whether she wanted to have sex—Kelly is not alleged to have offered her employment, mentioned a job, or identified himself as a manager at that time, (Dkt. No. 57, Attach. 24 at 16), is unconvincing.  If Kelly did send such a text, then he did so shortly after J.J. listed her cell phone number on the application and her interview, *i.e.*, while he was deciding whether or not to hire her.  (Pl.'s SMF ¶¶ 57-60.)  The evidence in the record reveals that "[a] jury could find, based on its cumulative perceptions and backgrounds, that requests for sexual activity are not always made explicitly, and failure to directly demand sexual favors as a condition for . . . employment does not negate indirect pressure."  *Wagner v. Burnham*, No. 1:03-CV-1522, 2006 WL 266551, at *8 (N.D.N.Y. Feb. 1, 2006) (internal quotation marks and citation omitted).  Because a supervisor sending such a sexually explicit text to a young female shortly following an interview may constitute *quid pro quo* sex discrimination—especially when she is not hired after refusing such an advance—Draper's motion must be denied.

     *2.    A.R.*

Draper primarily contends that Kelly was not empowered to hire A.R. for the particular assistant manager job that he specifically offered.[15]  (Dkt. No. 57, Attach. 24 at 15-16; Dkt. No. 62, Attach. 26 at 3-4.)  The EEOC rebuts this assertion, (Dkt. No. 58, Attach. 1 at 7-8), and argues that it is entitled to judgment as a matter of law on its claims pertaining to A.R., (*id.* at 9-11).

It is undisputed that Draper was hiring for a crew member and an assistant manager at Draper's Rotterdam Square Mall restaurant.  (Dkt. No. 64, Attach. 3 ¶ 34.)  It is also undisputed that Kelly was a general manager at this location from January 2013 to October 2013.  (Dkt. No. 62, Attach. 27 ¶ 5; Dkt. No. 64, Attach. 3 ¶¶ 19, 69.)  As general manager, Kelly had the authority to hire crew members to work at the Rotterdam Square Mall restaurant.  (Dkt. No. 58, Attach. 15 at 100; Attach. 16 at 69.)  However, Draper has provided credible evidence that Kelly lacked actual authority to hire assistant managers.  (Dkt. No. 62, Attach. 24 ¶ 4.)

Nonetheless, dismissal is precluded for at least two reasons.  First, it is undisputed that Kelly sent explicit texts to A.R. offering her a position

---

[15] Throughout its memorandum of law, Draper fails to support supposed factual assertions with citations to the record or its statement of material facts.  (Dkt. No. 57, Attach. 24 at 15-16, 19-20, 21-22.) The court declines to scour the record to find evidence supporting Draper's arguments where none is apparent.  *See Prive v. Johnson*, No. 5:04–CV–1024, 2010 WL 3338810, at *2 (N.D.N.Y. Aug. 23, 2010).

with Draper in exchange for sex.  (Dkt. No. 62, Attach. 27 ¶¶ 28-29.)  The

texts were offensive and unwelcome to A.R.  (*Id.* ¶¶ 30-32, 34-37, 42.)

Kelly initially inquired whether A.R. would have sex with him to get "the

job," which can reasonably be inferred to mean the crew member position

with Draper that A.R. applied for.  (Pl.'s SMF ¶¶ 16-17.)  Later in the text

exchange, Kelly specifically offered A.R. the assistant manager position in

exchange for sex.  (Dkt. No. 64, Attach. 8 at 96-101; Attach. 16 at 4.)  A

reasonable finder of fact could hold that, even if Kelly did not have actual

authority, it was reasonable to believe he had apparent authority to offer

her the assistant manager position based on the circumstances: A.R. was

seventeen, had applied for a position at Draper, provided her contact

information on her application, Draper empowered Kelly to access and

review applications, and Kelly held himself out as having such authority to

hire her for the assistant manager position.  (Pl.'s SMF ¶¶ 3, 5, 16-18;

Dkt. No. 62, Attach. 27 ¶¶ 28-29.)  It is undisputed that A.R. refused

Kelly's sexual advance and Draper did not hire her despite her

qualifications.  (Pl.'s SMF ¶¶ 20-23, 32, 70.)  Such a refusal to hire A.R.

for a position clearly constitutes a tangible employment action.  *See*

*Vance*, 570 U.S. at 429.  Accordingly, this claim hinges on the factual

issue of whether A.R. reasonably believed that Kelly had the authority to hire her, which is best resolved by a jury.  *See DeWitt*, 48 F. Supp. 2d at 290.

## C.  <u>Punitive Damages</u>

In addition to various other forms of relief, the EEOC seeks punitive damages.  (Compl. at 5-6.)  However, Draper claims such relief is unobtainable because it did not act with malice or reckless indifference.  (Dkt. No. 57, Attach. 24 at 24-25.)

To be sure, "[p]unitive damages are a discretionary moral judgment that the defendant has engaged in conduct that is so reprehensible that it warrants punishment."  *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015) (internal quotation marks and citation omitted).  Such damages may be awarded for employment discrimination claims only where the employer "engaged in a discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).

> A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions

violated federal law, or (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive.

*Wiercinski*, 787 F.3d at 115 (internal quotation marks and citation omitted). And "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with [federal law]." *Id.* (internal quotation marks and citation omitted).

For the reasons stated by the EEOC, (Dkt. No. 64 at 18-22), the court cannot say, after examining the evidence in the light most favorable to the non-movant and given the reasonable inferences that exist at this stage, that no reasonable juror could find an award of punitive damages to be appropriate. Accordingly, this portion of Draper's motion is also denied.

## D.    <u>Spoliation Sanctions</u>

The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation. Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence. The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge and is assessed on a

case-by-case basis.

*Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (internal citations omitted).

Draper fails to demonstrate that it is entitled to spoliation sanctions based on the alleged failure of A.R. and J.J. to preserve their electronic devices containing the text messages at the center of this action. (Dkt. No. 57, Attach. 24 at 22-24.) First, A.R. affirmatively preserved screen shots of the relevant text messages, and Draper does not dispute their accuracy or authenticity. (Dkt. No. 58, Attach. 7; Dkt. No. 64, Attach. 3 ¶ 59.) Second, even crediting Draper's assertion—raised for the first time in its reply papers—that "everything on [J.J.'s iPod] hard drive was wiped clean intentionally," (Dkt. No. 66, Attach. 5 at 7), Draper has not proven that any failure to preserve on the part of J.J. occured *after* a duty to preserve was triggered. Moreover, Draper's position is belied by J.J.'s deposition testimony that she never erased the relevant text messages. (Dkt. No. 64, Attach. 3 ¶ 101.) Accordingly, Draper's motion for spoliation sanctions is also denied.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

25

**ORDERED** that defendant's motion for summary judgment and spoliation sanctions (Dkt. No. 57) is **DENIED**; and it is further

**ORDERED** that plaintiff's motion for partial summary judgment (Dkt. No. 58) is **DENIED**; and it is further

**ORDERED** that this case is deemed trial ready and a scheduling order shall issue in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

July 11, 2018
Albany, New York

Gary L. Sharpe
U.S. District Judge